894 F.2d 401
 58 Ed. Law Rep. 470
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Stephen A. ARVINGER, Plaintiff-Appellant,
v.
MAYOR AND CITY COUNCIL OF BALTIMORE CITY; Baltimore City
Department of Education, and; Bernard Stokes,
Baltimore City Department of Education,
Defendants-Appellees.
 No. 88-2203.
 United States Court of Appeals, Fourth Circuit.
 Argued: Sept. 11, 1989.
Decided: Jan. 12, 1990.
 
 Kathleen M. Cahill, for appellant.
 John S. Wood, Chief Solicitor (Neal M. Janey, City Solicitor; Robert E. Chissell, Assistant Solicitor, on brief), for appellees.
 Before MURNAGHAN, SPROUSE and CHAPMAN, Circuit Judges.
 CHAPMAN, Circuit Judge:
 
 
 1
 This appeal is from the memorandum opinion and order of the district court, which found in favor of the defendants on Arvinger's claim brought pursuant to Sec. 704(a) of Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-3(a).[1] Arvinger claims that his employment with the city was terminated because of his statement given to the Baltimore Community Relations Commission (CRC) during an investigation of a claim of sex discrimination filed by Diane Diggs under Title VII of the Civil Rights Act. This is the second appeal resulting from Arvinger's termination. In the first appeal we reversed a jury verdict in favor of Arvinger on his claim of violation of his first amendment rights. In Arvinger v. Mayor and City Council of Baltimore, 862 F.2d 75 (4th Cir.1988), we found that the statements made by Arvinger, and which were the basis of his first cause of action, did not involve matters of public concern and were not entitled to first amendment protection. Upon remand the case was tried on the Title VII claim of a retaliatory discharge because of a statement made by Arvinger in an investigation under the Civil Rights Act. The district court found that plaintiff's statements to the CRC were not the "but for" cause of his termination and entered judgment for the defendants. We conclude that this finding was clearly erroneous, and we reverse and remand with instructions that judgment be entered for the plaintiff.
 
 
 2
 * The facts are adequately set forth in our prior opinion, and it is not necessary to repeat them in toto. It is sufficient to state that Arvinger made a number of statements concerning the possession and ownership of some marijuana found in his van on July 14, 1983, at a time when he was waiting for another school police officer, Diane Diggs, to return to the van. Some of these statements were inconsistent and contradictory. Following his last statement concerning the marijuana, which statement was made to a CRC investigator who was investigating Diane Diggs' claim of sex discrimination, Arvinger was fired by Chief Larry Burgan and Assistant Chief Bernard Stokes.
 
 
 3
 Arvinger's termination followed a December 4, 1984, hearing before Chief Burgan. At this hearing appellant was represented by a Mr. James Scott. The chief reviewed the various statements appellant had made about the possession and ownership of the marijuana found in his van and the contradictions and inconsistencies that were obvious in his statements.
 
 
 4
 Immediately after the hearing, Chief Burgan wrote a letter of termination to Arvinger confirming his termination. The letter stated in part:
 
 
 5
 At about 10:45 a.m. this date a hearing was conducted before me of a charge that you had conducted yourself in a manner unbecoming an officer in that you gave a false statement to an investigator for the Baltimore City Community Relations Commission. Such conduct violates school police General Order # 2, Section I, School Police personnel shall conduct themselves at all times in a manner that reflects creditabilty on themselves, on the Department of Education, and on the welfare of students. It is also recognized as cause for removal or discharge under Civil Service Commission Rule 56.g, Section (1), sub-sections (f) That the employee has committed acts while on or off duty which amount to conduct unbecoming to an employee of the City and (h) That the employee has violated any lawful or official regulation or order.
 
 
 6
 (Emphasis in original.) The letter then outlines the investigation that began in July 1983, which included false statements made by Arvinger to the police and resulted in Arvinger's suspension from the police force for approximately five weeks, without pay, while criminal charges were pending against him. These criminal charges were dropped in August 1983.
 
 
 7
 The chief had written a memorandum to Arvinger on September 12, 1983, outlining Arvinger's arrest and suspension until the charges against him were settled. The chief plainly stated to Arvinger in this memorandum that Arvinger's actions constituted violations of the security division general orders relating to conduct unbecoming a security officer. This memorandum concluded:
 
 
 8
 After reviewing the facts and your past record, it was my decision that you did commit the violations charged. I determined, however, that there was considerable evidence that the marijuana did not actually belong to you and that you do not use such substances yourself. With this in mind, I find that the loss of pay during the period of your suspension is sufficient penalty for your conduct and poor judgement [sic] in the matter.
 
 
 9
 It is my understanding that Assistant Chief Stokes has discussed this matter with you and that you do not wish to have a formal hearing of the matter. Be admonished, therefore, that future violations as described above will result in the termination of your employment.
 
 
 10
 In the letter of December 4, 1984, Chief Burgan concluded as follows:
 
 
 11
 In reviewing your record, I pointed out that I needed to go no further than my memorandum to you dated 9/12/83. In that memorandum I advised you that you were found to have conducted yourself in a manner unbecoming an officer partly because of your initial false statements to the police in this very same case. I found that the penalty for your conduct and poor judgment was the loss of five weeks pay and I cautioned you that future violations of a similar nature would result in the termination of your employment.
 
 
 12
 In light of this, it is my decision that your employment should be terminated effective this date. I have discussed this matter with Dr. Irving P. McPhail, Chief Operating Officer for the Baltimore City Public Schools, and he concurs with my decision. Be advised that you may request an investigation of the termination of your employment by the Baltimore City Civil Service Commission. Such requests should be made in writing within five days of the receipt of this letter to the Civil Service Commission, 111 N. Calvert Street, Baltimore, Maryland 21202.
 
 
 13
 During the discovery in the present action, the defendants answered an interrogatory as follows:
 
 
 14
 Interrogatory No. 2: Set forth the basis for the Department of Education's decision to discharge Mr. Arvinger from his employment.
 
 
 15
 Answer No. 2: The basis was Mr. Arvinger's false statements under oath at two separate agency hearings: the Community Relations Commission investigation and the Civil Service Commission hearing.
 
 
 16
 During trial, Chief Burgan gave testimony as follows:
 
 
 17
 Q. What was the reason, the motivation for your having terminated Mr. Arvinger's employment? Why did you terminate him?
 
 
 18
 A. I terminated him for giving false responses and information to the Community Relations Commission.
 
 
 19
 Q. Did the investigation that was conducted into the July 1983 incident have any bearing upon your motivation?
 
 
 20
 A. Yes, it did.
 
 
 21
 Q. Did you have occasion to speak to Mr. Arvinger yourself about this incident?
 
 
 22
 A. Yes, I did.
 
 
 23
 Q. What, if anything, did the investigation that was conducted reveal regarding what occurred on the evening of Mr. Arvinger's arrest in July of 1983?
 
 
 24
 MR. LANGHOFF: Objection, your honor.
 
 
 25
 THE COURT: Overruled.
 
 
 26
 THE WITNESS: The investigation revealed that Mr. Arvinger, in company with Ms. Diggs, had been in a van traveling for some reason about the city, had stopped at a given location in east Baltimore, that Ms. Diggs had exited the van, and while she was out of the van police officers had approached, had spoken to Mr. Arvinger, had at that time seen in plain view in his van a suspected controlled dangerous substance, being marijuana, and following certain discussion had placed him under arrest, transported him to the Eastern District.
 
 
 27
 Later that night the other officers I previously mentioned and Ms. Diggs had met with Mr. Arvinger at the Eastern District.
 
 
 28
 Q. Did the investigation reveal whether or not those other individuals spoke to Mr. Arvinger about his arrest and the circumstances surrounding his arrest?
 
 
 29
 A. Yes, it did.
 
 
 30
 Q. Did those statements from those individuals have any bearing upon your decision to terminate Mr. Arvinger, what their statements said?
 
 
 31
 A. Yes.
 
 
 32
 Q. What if anything else did the investigation reveal?
 
 
 33
 A. The investigation revealed that the controlled dangerous substance, marijuana, belonged to and had been placed in the van by Ms. Diggs.
 
 
 34
 Later while Chief Burgan was on cross-examination:
 
 
 35
 Q. Mr. Burgan, the only reason that you terminated Mr. Arvinger was based on his--on what--the report you received from Community Relations Commission; is that right?
 
 
 36
 A. That's correct.
 
 
 37
 Q. Anything that Mr. Arvinger may have done prior to that time, either the incident of June and July of 1983, that had nothing to do with your decision?
 
 
 38
 A. It had a bearing on my decision, certainly.
 
 
 39
 Q. But your decision to terminate--you had made a decision as to what punishment you would mete out to Mr. Arvinger as a result of the incident in July of '83, did you not?
 
 
 40
 A. I made the decision at that time, yes.
 
 
 41
 Q. That decision was final at that time, was it not?
 
 
 42
 A. With a warning.
 
 
 43
 Q. That decision was to suspend him for a period of five weeks; is that correct?
 
 
 44
 A. That's correct.
 
 
 45
 In denying plaintiff's claim, the district court concluded its Findings of Fact and Conclusions of Law as follows:
 
 
 46
 After much consideration, the Court concludes that the plaintiff's testimony before the Human Relations Commission[2] was not the "but for" cause of his discharge from the school police force. While it is true that plaintiff may not have been dismissed had he not testified before the Commission, it is also true that plaintiff would not have been dismissed for that testimony alone. Simply stated, plaintiff would not have been discharged "but for" his testimony alone. Rather, Chief Burgan dismissed plaintiff for what Burgan saw as a pattern of false statements and plaintiff's association with an illegal drug. Had it not been for this prior behavior, Burgan would not have dismissed plaintiff. Plaintiff's testimony before the Commission, therefore, was not the "but for" cause of his dismissal, but merely the "last cause" or a cause "in part."
 
 II
 
 47
 In Ross v. Communications Satellite Corp., 759 F.2d 355, 365 (4th Cir.1985), we stated:
 
 
 48
 The sequence of proof and burdens prescribed by McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-25, 36 L.Ed.2d 668 (1973), and Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-56, 101 S.Ct. 1089, 1093-95, 67 L.Ed.2d 207 (1981) are applicable to retaliation cases under Sec. 2000e-3 as well as to discriminatory treatment claims. Williams v. Boorstin, 663 F.2d 109, 116 (D.C.Cir.1980); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir.1980). The employee is initially required to establish a prima facie case of retaliation by a preponderance of the evidence. Such a prima facie case consists of three elements: 1) the employee engaged in protective activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action. [Citations omitted.] As in disparate treatment cases, the burden of establishing a prima facie retaliation case "is not onerous". Burdine, 450 U.S. at 253, 101 S.Ct. at 1093. Once a prima facie case has been presented, the employer then has the burden of producing a legitimate nondiscriminatory reason for the adverse action, thereby rebutting the presumption of retaliation raised by the prima facie case. Womack, 619 F.2d at 1296. The employer is not required to prove the absence of a retaliatory motive, but only to raise a "genuine issue of fact," Burdine, 450 U.S. at 254, 101 S.Ct. at 1094, as to whether retaliation for protected activity occurred. Finally, if the employer produces a legitimate nondiscriminatory explanation, the employee bears the ultimate burden of proving retaliation by demonstrating that the employer's proffered reason is pretextual. Womack, 619 F.2d at 1296.
 
 
 49
 For the employee to disprove a legitimate nondiscriminatory explanation for adverse action, the third stage of the Burdine analysis, we determine that he must show that the adverse action would not have occurred "but for" the protected conduct. We reject the view that Title VII has been violated if retaliation for protected activity was merely "in part" a reason for the adverse action.
 
 
 50
 The trend among the circuits is clearly in favor of the "but for" standard, or similar formulations. [Citations omitted.] This Circuit has previously expressed a preference for the "but for" test as well. [Citations omitted.] The "but for" standard serves the salutary function of directing the factfinder's attention to the predominant reason for an employer's adverse action. It ensures that no employee will suffer prejudice by exercising his lawful right to protest perceived discrimination.
 
 
 51
 The district court concluded that plaintiff's testimony before the Human Relations Commission was not the "but for" cause of his termination "but merely the 'last cause' or a cause 'in part'." We are persuaded that this finding and conclusion are clearly erroneous under this Circuit's definition set forth in Ente Nazionale Per L'Energia v. Baliwag Nav., 774 F.2d 648 (4th Cir.1985):
 
 
 52
 "A finding is clearly erroneous when 'although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed.' " ... (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)).
 
 
 53
 Id. at 654 (quoting McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 8, 99 L.Ed. 20 (1954)).
 
 
 54
 The district court found as a fact that plaintiff had testified on November 4, 1983, at a Civil Service Commission hearing on the termination of Diane Diggs that he was uncertain as to whether the marijuana found in his van on July 14, 1983, belonged to Diggs, and that Chief Burgan wanted to fire plaintiff at that time, because he believed plaintiff's testimony was dishonest, but the Chief was prevented by the Civil Service Commission hearing officer from firing Arvinger. The district court went on to find:
 
 
 55
 18. In March 1984, Diggs brought a sex discrimination charge against defendants before the Baltimore Community Relations Commission. In June, plaintiff was interviewed as a witness by an investigator for the Commission. Plaintiff again stated uncertainty as to whether the marijuana found in his van belonged to Diggs. The Commission concluded that probable cause existed to believe that defendants had discriminated against Diggs.
 
 
 56
 19. When Chief Burgan received a copy of the Commission's findings and saw that plaintiff had testified that he was uncertain as to whether the marijuana in question belonged to Diggs, he decided to terminate plaintiff.
 
 
 57
 20. On December 4, 1984, plaintiff met with defendants and was informed that he was being terminated.
 
 
 58
 21. Unrefuted testimony by the plaintiff at trial shows that during his first two meetings with defendant Stokes following plaintiff's arrest, Stokes made statements to the effect that he wanted Diggs off the police force and that plaintiff should state that the marijuana belonged to Diggs so that he could achieve that goal.
 
 
 59
 22. Nevertheless, it was Burgan who made the decision to fire plaintiff. Chief Burgan, a most credible witness, testified that the decision to terminate plaintiff had nothing to do with Ms. Diggs.
 
 
 60
 23. While defendant Burgan testified that plaintiff was fired because of his testimony before the Human Relations Commission, he also testified that plaintiff's conduct, as revealed by the investigation undertaken following his arrest, also influenced his decision.
 
 
 61
 24. Chief Burgan fired plaintiff for a pattern of conduct that Burgan determined to be inconsistent with plaintiff's duties as a school police officer. This pattern of conduct included an association with an illegal drug and a series of statements Burgan believed to be untrue. Indeed, Burgan was inclined to fire plaintiff prior to plaintiff's testimony before the Human Relations Commission.
 
 
 62
 There are several reasons we find clearly erroneous the district court's conclusion that plaintiff's statement before the CRC was not the "but for" cause of his termination.
 
 
 63
 First, the defendants' answer to Interrogatory 2 states that Arvinger's false statements under oath before the CRC and the CSC were the basis for the discharge. Chief Burgan in his testimony at the trial stated in answering a question as to his motivation for terminating Arvinger: "I terminated him for giving false responses and information to the Community Relations Commission." On cross-examination he gave an answer to the same effect.
 
 
 64
 Second, shortly before terminating plaintiff on December 4, 1984, Chief Burgan in a memorandum of November 26, 1984, to Mr. Alan W. Harris, Director of Labor Relations for the city, explained the CRC finding relating to Diane Diggs. He concluded this report as follows:
 
 
 65
 While we were prevented from taking action against the other employee in this case for lying to the Civil Service Commission Hearing Officer, I feel that his lying to the Community Relations Commission investigator is cause for termination. That, frankly, is the only further action that I believe we should take in this matter.
 
 
 66
 The other employee referred to is Arvinger.
 
 
 67
 Third, in the letter of December 4, 1984, to Arvinger explaining his termination, Chief Burgan states the charge against Arvinger as, "[Y]ou had conducted yourself in a manner unbecoming an officer in that you gave a false statement to an investigator for the Baltimore City Community Relations Commission."
 
 
 68
 Fourth, the events of the evening of July 14, 1983, the plaintiff's actions on that night, and his actions during the ensuing investigation had been closed. Ms. Diggs had been terminated, the criminal charges against plaintiff had been dismissed, and plaintiff had been disciplined in the form of a suspension without pay for a number of weeks. The plaintiff was fired almost a year and a half after July 1983. We do not believe these actions can be resurrected to become a "predominant reason" for plaintiff's discharge in December 1984.
 
 
 69
 Fifth, Chief Burgan admitted to the Director of Labor Relations that he wanted to fire Arvinger as a result of his lying to the Civil Service Commission Hearing Officer, but was prevented from doing so. Apparently, the chief was not aware of the prohibition contained in Sec. 2000e-3(a) when he made this report and took the action of firing Arvinger.
 
 
 70
 Sixth, as previously mentioned, this is not our first encounter with these parties. In Arvinger I, we considered the plaintiff's claims under 42 U.S.C. Sec. 1983. A review of the earlier appeal reveals a definite change in the defendants' position. In their brief in Arvinger I, in the Statement of the Case, defendants stated:
 
 
 71
 Arvinger claimed and the jury found that he was terminated from his school police force position due to comments he made in the course of a sex discrimination investigation conducted by the Baltimore Community Relations Commission ("CRC"), pursuant to a sex discrimination charge filed by one of Arvinger's fellow employees. Arvinger claimed that he was fired for statements related to this discrimination investigation. The Agency claimed that he was fired because of the false nature of the statements he made.
 
 
 72
 The City of Baltimore's Department of Education is referred to as the "Agency" in this brief. In their argument at page 13 of the prior brief, defendants admitted:
 
 
 73
 While both parties agree that Arvinger's very words led to his firing, each characterizes the cause of his discharge in materially different ways. Plaintiff says the firing was merely due to his testimony supporting Diggs (presumably, interfering with the Defendants [sic] discriminatory motives, according to Arvinger's theory of the case). Defendants say the firing was due to Arvinger having implicated Diggs previously (which led the Agency to discharge her) and deliberately contradicting himself before the CRC.
 
 
 74
 * * *
 
 
 75
 * * *
 
 
 76
 Arvinger was discharged, not for the fact of his comment, but because it was false in the judgment of the Agency.
 
 
 77
 In these statements, the defendants clearly state that Arvinger was discharged because of his testimony before the CRC and Chief Burgan's belief that this testimony was false.
 
 
 78
 Seventh, in a memorandum order of November 2, 1987, the district court explained its reasons for denying the defendants' motion for a directed verdict made at the close of the plaintiff's case. In footnote 1 to this order, the court mentions Jurgensen v. Fairfax County, Va., 745 F.2d 868 (4th Cir.1984), and states: "A further distinction between this case and Jurgensen is that the defendants and plaintiff in this case agree that plaintiff's speech was the 'but for' cause of his discharge."
 
 
 79
 Defendants argue that plaintiff's testimony to the CRC was false and such testimony is not protected under Sec. 2000e-3(a). This presents the issue of who decides questions of employee credibility. It is obvious from the purposes of the Civil Rights Act of 1964 that this decision is not left to the employer alone. In Pettway v. American Cast Iron Pipe Company, 411 F.2d 998 (5th Cir.1969), the district court found that the employee had filed a false and malicious accusation that the employer had bribed federal officers in the exercise of their duties, that such false statement was good and sufficient cause to discharge the employee, and that the discharge was in no way motivated by an intent to retaliate against the employee for filing or prosecuting an earlier charge of employment discrimination.
 
 
 80
 The Fifth Circuit reversed and held that the giving of information by employees was essential to the carrying out of the congressional policy embodied in the Civil Rights Act, and that the employee could not be discharged for filing a charge--even a false charge.
 
 
 81
 There can be no doubt about the purpose of Sec. 704(a). In unmistakable language it is to protect the employee who utilizes the tools provided by Congress to protect his rights. The Act will be frustrated if the employer may unilaterally determine the truth or falsity of charges and take independent action.
 
 
 82
 Id. at 1004-05.
 
 
 83
 Pettway involved a person who filed a charge of discrimination, but its holding, and the language of Sec. 2000e-3(a), clearly provide the same protection to Arvinger, who testified at a hearing on a charge filed under Title VII of the Civil Rights Act: "It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has ... testified ... in any manner in an investigation, proceeding, or hearing under this Title."
 
 
 84
 While we may sympathize with the employer having to deal with an employee who has made conflicting and contradictory statements in an important investigation, the employee is protected from discharge because of his statements if they are made in connection with an investigation, proceeding or hearing under Title VII.
 
 
 85
 We find the district court to be clearly erroneous in its finding and conclusion that Arvinger's testimony before the Baltimore CRC was not the "but for" cause of his discharge. As we stated in Ross v. Communications Satellite Corp., supra, "[t]he 'but for' standard serves the salutary function of directing the factfinder's attention to the predominant reason for the employer's adverse action." Whether it is called the "but for" cause or the "predominant reason," we are "left with a definite and firm conviction," after a review of the entire record, that Arvinger was discharged because of his testimony before the CRC, and that he would not have been discharged in December 1984 if he had not testified before the CRC. Therefore, this testimony, which is protected by Sec. 2000e-3(a), became the "but for" cause and the "predominant reason" for his discharge.
 
 
 86
 The judgment of the district court is reversed and this case is remanded with directions to enter judgment for the plaintiff.
 
 
 87
 REVERSED AND REMANDED.
 
 
 
 [1]
 42 U.S.C. 2000e-3(a) reads in pertinent part:
 It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment ... because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.
 
 
 [2]
 At various times during trial the Baltimore Community Relations Commission was referred to as the Human Relations Commission